UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

DAVID REEVES AND VIRGINIA
REEVES,

                 **Plaintiffs,**

   - against -

DETECTIVE RICHARD ANDERSON,
POLICE OFFICER JOHN DOE, CHIEF
CHRISTOPHER SATRIALE, THE
VILLAGE OF BRONXVILLE AND THE
VILLAGE OF BRONXVILLE POLICE
DEPARTMENT,

                **Defendants.**

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _12/24/14_

## OPINION AND ORDER

### 11-cv-3770 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

David Reeves and Virginia Reeves bring this suit against Detective

Richard Anderson, Chief Christopher Satriale, and the Village of Bronxville and

the Village of Bronxville Police Department under Section 1983 of Title 42 of the

United States Code ("Section 1983"), alleging primarily that Mr. Reeves's

constitutional rights were violated when law enforcement officers questioned him,

searched his personal property and vehicle, and brought him to a nearby police

1

station for additional questioning and searches.  Based on this police activity and a

subsequent publication of a police bulletin concerning Mr. Reeves, plaintiffs assert

a litany of federal and state law claims, seeking relief for the alleged resulting

impact to Mr. Reeves's reputation and ability to seek employment.[1]  Defendants

now move for summary judgment on all claims asserted against them on the

grounds that Mr. Reeves consented to the searches and questioning, and that

information published about him was true and did not violate Mr. Reeves's due

process rights.[2]  For the reasons set forth below, defendants' motion is GRANTED.

## II.    BACKGROUND[3]

### A.    The Events Leading to the Search

Mr. Reeves was formerly employed as a contract administrator for KG

& D Architect, a company performing construction work for the village of

---

[1]    *See* Amended Complaint ("Am. Compl.) at 11-25.  When referring to allegations in the Amended Complaint, this Opinion cites page numbers, not paragraph numbers, because the paragraph numbering in the Amended Complaint is defective.

[2]    *See generally* Defendants' Memorandum of Law in Support of Its [sic] Motion for Summary Judgment ("Def. Mem.").

[3]    The facts recited below are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the declarations submitted in connection with this motion, and the exhibits attached thereto.  These facts are undisputed unless otherwise noted.  Where disputed, the facts are viewed in the light most favorable to the nonmoving party.  *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006).

Bronxville.[4]  On the morning of May 4, 2010, Mr. Reeves drove to Bronxville

High School, where he had a work-related appointment scheduled for later in the

day.[5]  Having arrived very early for his appointment, Mr. Reeves remained in his

car, which he parked approximately two hundred feet away from the school.[6]

As Mr. Reeves sat in his car, a telephone company worker parked

behind Mr. Reeves started to observe over the course of forty-five minutes what he

considered to be suspicious behavior.  According to the telephone company

worker, whenever a group of girls walked by, Mr. Reeves would raise up his cell

phone and take a picture.[7]  Eventually, the telephone company worker called 911 to

report Mr. Reeves's conduct.[8]  In response to the complaint, Officer Nicholas

DeYoung arrived on the scene, followed soon after by Detective Anderson, both of

---

[4]      *See* Am. Compl. at 3.

[5]      *See id.*

[6]      *See* Plaintiffs' Local Rule 56.1(b) Statement ("Pl. 56.1") ¶ 1.  Like
their Amended Complaint, plaintiffs' Rule 56.1 Statement also contains defective
paragraph numbering.  For the portion of the document under the header "Local
Rule 56.1(b) Statement," I cite the relevant paragraph numbers, which correspond
to those contained in defendants' 56.1 Statement.  When citing to paragraphs in the
portion of the document under the header "Disputed Issues of Material Fact," I
refer to the ECF page number.

[7]      Defendants' 56.1 Statement of Undisputed Facts ("Def. 56.1") ¶ 5.

[8]      *See id.* ¶ 4; Pl. 56.1 ¶ 4.

the Bronxville Police Department.[9]

## B.  The Search Outside of the High School

Detective Anderson approached Mr. Reeves, informed him of the complaint, and asked him if he had been taking photographs.[10]  Mr. Reeves responded in the negative.[11]  Detective Anderson then asked Mr. Reeves if he had any cameras with him; Mr. Reeves voluntarily gave Detective Anderson a camera that he had in his vehicle.[12]  Detective Anderson inspected that camera and did not find any pictures on it.[13]

Detective Anderson also observed that Mr. Reeves possessed a camera-equipped smartphone.[14]  Detective Anderson asked Mr. Reeves for permission to "take a look at [the camera phone]."[15]  Mr. Reeves obliged and

---

[9]      *See* Def. 56.1 ¶ 3.

[10]     *See id.* ¶ 6.

[11]     *See id.* ¶ 7.  No pun intended.

[12]     *See id.* ¶ 8.

[13]     *See id.* ¶ 9.

[14]     *See* 8/28/12 Deposition of Richard Anderson, Ex. D to 11/4/13 Declaration of Philip Russell, counsel for plaintiffs, in Opposition to Defendants' Motion for Summary Judgment ("Russell Decl.") ("Anderson Dep."), at 43:2-43:5.

[15]     *Id.*

handed Detective Anderson the phone.[16]  Upon receiving the phone, Detective

Anderson reviewed the photographs stored on it from that morning.[17]

Although Mr. Reeves claims that he was shooting pictures of a "bay

brick building,"[18] it is undisputed that included in several of these photographs

were girls who appeared to be school-aged.[19]  These photographs displayed young

girls' backsides, primarily focusing on girls wearing short skirts and short shorts.[20]

---

[16]    *See id.* at 43:8-43:9.  Detective Anderson did not take the phone from inside the car; instead, Mr. Reeves handed it to him while Detective Anderson remained outside the car.  *See id.* at 43:10-12.

[17]    *See* 12/7/10 David Reeves's 50-H Hearing, Ex. B to 9/13/13 Declaration of Matthew Weir, counsel for defendants, Submitted in Support of Defendants' Motion for Summary Judgment ("Weir Decl") (" Reeves's 50-H Hr'g"), at 33:7-34:17.

[18]    Pl. 56.1 ¶ 1.

[19]    *See* 5/4/10 Photographs Taken by Mr. Reeves, Ex. A to Weir Decl. ("May 4 Photographs"); Def. 56.1 ¶¶ 1, 19.

[20]    *See* Def. 56.1 ¶ 19.  Plaintiffs deny that Mr. Reeves "zoomed in" on the short skirts and shorts.  *See* Pl. 56.1 ¶ 19.  Instead, plaintiffs maintain that the "the subject" of the photographs was the bay brick building, not the "females depicted . . . [who] varied in age."  *Id*. at 8.  Plaintiffs' general characterizations of the photographs are disingenuous, at best, and are plainly contradicted by the photographic evidence and testimony in the record.  While the Court must view the facts in the light most favorable to plaintiffs and "cannot make credibility determinations in deciding a motion for summary judgment, [the Court] need not credit assertions that are wholly contradicted by photographic evidence in the record."  *Matteo v. Kohl's Dep't Stores, Inc.*, No. 09 Civ. 7830, 2012 WL 760317, at *7 (S.D.N.Y. Mar. 6, 2012) *aff'd*, 533 Fed. App'x 1 (2d Cir. 2013) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Specifically, Detective Anderson reviewed five pictures.[21]  One of those photographs contains no brick building or building of any sort; it is actually a close-up image of the backsides of two girls wearing a short skirt and short pair of shorts, respectively.[22]  Girls' backsides are also displayed in the remaining four photographs, which are taken from a more distant perspective.[23]

After reviewing these photographs, Detective Anderson asked Mr. Reeves for permission to search Mr. Reeves's vehicle.[24]  Mr. Reeves again, in his words, "agreed" to Detective Anderson's request.[25]  In the vehicle, Detective Anderson discovered a laptop and another camera device.[26]

### C.  Continued Questioning at the Police Station

At this point, Detective Anderson asked Mr. Reeves if he would come to the police station to discuss the matter further "outside of the public eye."[27]  Mr.

---

[21]    *See* May 4 Photographs.

[22]    *See id.*; Def. 56.1 ¶ 19.

[23]    *See* May 4 Photographs; Def. 56.1 ¶ 19.

[24]    *See* Def. 56.1 ¶ 10.

[25]    Reeves's 50-H Hr'g at 33:17.

[26]    *See* Def. 56.1 ¶ 11.

[27]    Anderson Dep. at 54:3.  *See also* Def. 56.1 ¶ 12; Reeves's 50-H Hr'g at 34:16-34:24.

Reeves agreed and handed over his car keys to another officer, who drove Mr.

Reeves's car to the station while Mr. Reeves was driven there by Officer

DeYoung.[28]

  When they arrived at the police station, Mr. Reeves signed a "Consent

to Search Form," which stated that the police could search Mr. Reeves's vehicle

and all electronic storage devices Mr. Reeves had on his person or inside his

vehicle.[29]  Detective Anderson conducted a search of Mr. Reeves's belongings,

including the additional camera device found in his car, which contained videos

---

[28] *See* Anderson Dep. at 54:16-54:23; Reeves's 50-H Hr'g at 34:16-34:24.

[29] *See* Def. 56.1 ¶ 13; 5/4/10 Consent to Search Form, Ex. F to Weir Decl.  In an affidavit opposing defendants' summary judgment motion, Mr. Reeves contends that the form was blank when he signed it.  *See* 11/4/13 Affidavit of David Reeves, Ex. H to Russell Decl. ("Reeves Aff.") ¶ 22.  However, during his 50-H hearing, Mr. Reeves made no such allegation; instead, he stated:  "Detective Anderson comes in, puts a piece of paper [sic] and asked me to sign off on the search of my vehicle.  I sign it, [and] he leaves."  Reeves's 50-H Hr'g at 35:2-32:5.  Because Mr. Reeves's affidavit contradicts his sworn prior testimony, I need not credit it.  *See Hayes v. New York City Dep't of Corrs.*, 84 F. 3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").  In any event, this manufactured factual dispute is immaterial, as Mr. Reeves does not deny that he explicitly consented to a search of his vehicle and electronic devices before reaching the police station.

and images of children outside of other schools in nearby towns.[30]  Detective

Anderson then questioned Mr. Reeves further concerning his activities that

morning.[31]  After he finished questioning Mr. Reeves, Detective Anderson returned

the property to Mr. Reeves and asked him to stand by a wall so that Detective

Anderson could take a photograph of him.[32]  According to Mr. Reeves, upon

leaving the station, he extended his hand to Detective Anderson for a handshake,

and Detective Anderson squeezed Mr. Reeves's hand, pulled it towards his belt

buckle, and admonished Mr. Reeves to "get help for [Mr. Reeves's] problem."[33]

Mr. Reeves then left the police station on his own.[34]  He was not charged with any

crime; the pictures he took that morning were not illegal.[35]

       At no point during these events did anyone explicitly instruct Mr.

Reeves that he could refuse police requests to search Mr. Reeves's property near

---

[30]     *See* Def. 56.1 ¶¶ 14, 18.  Specifically, the police officers found pictures and videos of school-aged children in Mahopac, Carmel, and Kent, though Mr. Reeves insists that he took the photographs and video clips for purposes related to his construction work.  *See* Pl. 56.1 ¶ 18.

[31]     *See id.* ¶ 14.

[32]     *See id.* ¶ 15.  Mr. Reeves testified at his 50-H hearing that he agreed to this request.  *See* Reeves's 50-H Hr'g at 37:8-37:12.

[33]     Reeves's 50-H Hr'g at 38:2-38:10.

[34]     *See id.*

[35]     *See* Def. 56.1 ¶ 19.

the high school or at the police station, or that he was free to leave, nor did anyone ever instruct Mr. Reeves that his compliance with these requests was mandatory.[36] Mr. Reeves now testifies that he believed his cooperation was mandatory, though he admits that he never communicated to any officer a desire to leave or decline to supply requested information, and that no one told him he could not leave.[37]

### D.    The Police Information Bulletin

Detective Anderson ultimately prepared a police information bulletin regarding Mr. Reeves's activities, intending to disseminate it to the District Attorney's office in Putnam County so that the office could pass it on to the police departments in that county as an investigatory tool.[38]  The bulletin contained an account of Mr. Reeves's activities outside of Bronxville High School, stating that Mr. Reeves was found in possession of a camera phone containing five pictures of twelve to fourteen year old girls in miniskirts outside of the school, as well as another camera consisting of thirty videos of young girls outside of a Mahopac school and near the Carmel and Kent school areas.[39]  The bulletin also includes

---

[36]    *See* Pl. 56.1 at 8.

[37]    *See id.*; Def. 56.1 ¶ 17.

[38]    *See* Def. 56.1 ¶ 22.

[39]    *See* Police Information Bulletin, Ex. G to Weir Decl. ("Police Bulletin").

pictures of Mr. Reeves and his vehicle.[40]

After drafting the bulletin, Detective Anderson spoke about it over the telephone with Henry Lopez, an investigator in the Putnam County District Attorney's office.[41]  Detective Anderson then sent the bulletin to Investigator Lopez so that it could be distributed to area law enforcement agencies.[42] Investigator Lopez, upon receiving the bulletin, understood that it was intended only for law enforcement purposes, not for public dissemination.[43]  To that end, he subsequently distributed the bulletin to an e-mail list of law enforcement personnel within Putnam County.[44]  At some later point, Investigator Lopez learned that the bulletin was forwarded to personal e-mail (non-governmental) addresses by at least two law enforcement personnel – one Westchester Probation employee and one Assistant District Attorney in Investigator Lopez's office.[45]  The Assistant District Attorney then apparently forwarded the bulletin to her husband, who subsequently

---

[40]     *See id.*

[41]     *See* Def. 56.1 ¶ 23.

[42]     *See id.* ¶ 24.

[43]     *See id.* ¶ 25.

[44]     *See id.* ¶ 26.

[45]     *See id.* ¶¶ 28-29.

forwarded the bulletin to other members of the public.[46]

As a result of the public dissemination of the police bulletin, Mr. Reeves claims that he lost his job at the construction company and has been unable to regain steady employment, and that he and his wife have suffered severe emotional distress.[47]

## III.   LEGAL STANDARD

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[48]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[49]

"[T]he moving party has the burden of showing that no genuine issue

---

[46]     *See id.*

[47]     *See* Pl. 56.1 at 9.

[48]     *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

[49]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law."[50]  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts,"[51] and "may not rely on conclusory allegations or unsubstantiated speculation."[52]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[53]  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[54]

## IV.    APPLICABLE LAW

### A.    Section 1983

------------------------------------

[50]     *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

[51]     *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[52]     *Id.* (quotation marks and citations omitted).

[53]     *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[54]     *Barrows v. Seneca Foods Corp.*, 512 Fed. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)).

Section 1983 states, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[55]  "The purpose of [section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."[56]  In order to have recourse against a municipality under section 1983, a plaintiff "must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury."[57]  Any form of liability under section 1983 requires direct involvement by the defendant in causing the

---

[55]     *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 158-59 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).  *Accord Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("'[O]ne cannot go into court and claim a violation of § 1983-for § 1983 by itself does not protect anyone against anything.'") (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979)).

[56]     *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

[57]     *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)).

plaintiff's damages.[58] "Because vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[59]

## B.    The Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[60] Section 1983 claims for false arrest and illegal search and seizure arise under the Fourth Amendment and are identical to claims for false arrest and illegal search and seizure under New York law.[61]

To establish claims for false arrest (or unlawful detention), a plaintiff must show, among other factors, that "the plaintiff did not consent to the confinement" and that "'the confinement was not otherwise privileged.'"[62] Under

---

[58]    *See Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

[59]    *Id.* (citations omitted).

[60]    U.S. Const. amend. IV.

[61]    *See Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Jenkins v. City of New York*, 478 F.3d 76, 84–85 (2d Cir. 2007).

[62]    *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)). *See also Edwards v. Pretsch*, 180 F. Supp. 2d 489, 507 (S.D.N.Y. 2012) (noting that for Section 1983 purposes, false arrest is synonymous with unlawful detention).

14

the Fourth Amendment, warrantless searches are presumptively unreasonable.[63]
However, "[i]t is well settled that a warrantless search does not violate the Fourth
Amendment if 'the authorities have obtained the voluntary consent of a person
authorized to grant such consent.'"[64]   Ultimately, the Government must show that
consent was voluntary by a preponderance of the evidence.[65]

### 1.   Consent

"The standard for measuring the scope of a suspect's consent under
the Fourth Amendment is that of 'objective' reasonableness – what would the
typical reasonable person have understood by the exchange between the officer and
the suspect?"[66]   "Whether authorities obtained voluntary consent . . . "'is a question
of fact to be determined from the totality of all the circumstances.'"[67]   "Factors that
courts consider in assessing the voluntariness of a consent include the individual's
age, intelligence and educational background, the length and nature of the

---

[63]      *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

[64]      *United States v. Hernandez*, 85 F.3d 1023, 1028 (2d Cir. 1996)
(quoting *United States v. Elliot*, 50 F.3d 180, 185 (2d Cir. 1995)).

[65]      *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983).

[66]      *United States v. Kelly*, 553 Fed. App'x 91, 94 (2d Cir. 2014) (quoting
*Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

[67]      *United States v. Rico Beltran*, 409 Fed. App'x 441, 442-43 (2d Cir.
2011) (quoting *Schneckloth*, 412 U.S. at 227).

questioning and whether the law enforcement officials engaged in coercive behavior."[68]  "[N]either the fact that a person is in custody nor that she has been subjected to a display of force rules out a finding of voluntariness."[69]

The concept of a "knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial, does not govern in the Fourth Amendment context."[70]  Therefore, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account," "the government need not establish such knowledge as the sine qua non of an effective consent."[71]

### C.    Stigma-Plus Claim

A "stigma-plus" claim is a subset of procedural due process.  It is "brought for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process."[72]

---

[68]    *United States v. Jones*, 154 F. Supp. 2d 617, 621 (S.D.N.Y. 2001).

[69]    *United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2797 (2013) (citing *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004)).

[70]    *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

[71]    *United States v. Drayton*, 536 U.S. 194, 206-07 (2002) (internal quotation marks omitted).

[72]    *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (citations omitted).  *Accord S & D Maintenance Co. v. Goldin*, 844 F.2d 962, 970 (2d Cir. 1988) ("A government employee's liberty interest is implicated where the government dismisses him based on charges that might seriously damage his

A stigma-plus claim has three elements:  statements (1) by the government that call

into question plaintiff's "good name, reputation, honor, or integrity" or "denigrate

[his] competence as a professional and impugn [his] professional reputation in such

a fashion as to effectively put a significant roadblock on [his] continued ability to

practice [his] profession;" (2) that were public; and (3) that "were made

concurrently in time to [his] dismissal from government employment."[73]  The

Second Circuit has urged that "defamation is not by itself a deprivation of a liberty

interest unless coupled with the termination of government employment 'or

deprivation of some other legal right or status.'"[74]

## V.   DISCUSSION[75]

---

standing and associations in his community or that might impose on him a stigma
or other disability that forecloses his freedom to take advantage of other
employment opportunities.") (quotation marks and alterations omitted).

   [73]   *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004)
(quotation marks omitted).  With regard to the publication requirement, "[t]he
defamatory statement must be sufficiently public to create or threaten a stigma;
hence, a statement made only to the plaintiff, and only in private, ordinarily does
not implicate a liberty interest." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005).

   [74]   *Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir. 1994) (quoting *Neu v.
Corcoran*, 869 F.2d 662, 667 (2d Cir. 1989) (citing *Paul v. Davis*, 424 U.S. 693,
709 (1976))).

   [75]   Although Mr. Reeves's wife is a named plaintiff in this action, there is
virtually no evidence in the record related to her, nor any allegation in the amended
complaint explaining in any detail how she has been harmed, other than that she
suffered emotional distress.  To the extent that Ms. Reeves is also bringing federal

## A.     Fourth Amendment Claims

Defendants move for summary judgment on Mr. Reeves's Fourth Amendment claims primarily on the ground that Mr. Reeves consented to the police searches of his property and his vehicle and agreed to answer all of the officers' questions.  To the extent that they did violate Mr. Reeves's Fourth Amendment rights, Detective Anderson and Chief Satriale argue in the alternative that they are entitled to summary judgment on the ground of qualified immunity. Because I agree with defendants that Mr. Reeves's Fourth Amendment rights were not violated, I need not address the qualified immunity ground.[76]

### 1.     Reeves Consented to the Searches and Police Questioning

Mr. Reeves's Fourth Amendment claims, which relate to the search of his camera phone, vehicle, and personal property found within it, as well as his questioning outside of the high school and at the police station, must be dismissed because he voluntarily consented to all of the police conduct of which he now complains.  To overcome the clear manifestations in the record of his consent to

---

claims against defendants, those claims are dismissed.

[76]     Even if Detective Anderson and Chief Satriale had violated Mr. Reeves's Fourth Amendment rights, which they did not, a qualified immunity analysis would likely favor the officers because, at minimum, reasonable officers could disagree over whether the alleged search and seizure of Mr. Reeves was unlawful given his expressions of consent.  *See Saucier v. Katz*, 533 U.S. 194 (2001).

the searches and questioning, Mr. Reeves attempts to argue that his consent was not freely given.[77]  In support of this contention, Mr. Reeves relies heavily on the fact that the officers never told him he was free to leave, and that the questioning at the police station occurred in a room behind closed doors for roughly two hours.[78] Having never been arrested, he also insists that he did not believe that he could leave or refuse any of the searches.[79]

These arguments fail as a matter of law.  Where a suspect has consented to conduct implicating his Fourth Amendment rights, courts require much more police coercion than what Mr. Reeves faced to render that consent involuntary.  For instance, the Second Circuit has noted that "[t]he fact that [defendant] [is] in custody for five hours [does] not compel a finding that his consent was involuntary."[80]  Even "handcuffing and display of guns by five or six officers to effectuate [an] arrest did not render consent to [a] search involuntary."[81] The facts in the record here are not nearly as damning.  It is undisputed that Mr. Reeves was never handcuffed or exposed to any real show of force, and that he was

---

[77]     *See* Pl. 56.1 at 8.

[78]     *See id.*

[79]     *See id.*

[80]     *United States v. Arango Correa*, 851 F.2d 54, 57-58 (2d Cir. 1988).

[81]     *Moreno*, 701 F.3d at 77 (citing *Ansaldi*, 372 F.3d at 129).

questioned for approximately two hours.  Throughout this process, it is undisputed that Mr. Reeves repeatedly agreed to answer the officers' questions and voluntarily turned over his property to be searched.  The officers never communicated to him that he could *not* leave or *needed* to turn over his property – their failure to inform him about his freedom to refuse to consent cannot save his claims.[82]  Because the undisputed evidence shows that Mr. Reeves freely and voluntarily consented to the searches of his property and police questioning, summary judgment is granted to Detective Anderson and Chief Satriale on Mr. Reeves's Fourth Amendment claims against them.[83]

### B.      Mr. Reeves Was Not Deprived of a Constitutionally Protected Interest

Mr. Reeves also alleges that the dissemination of the police bulletin deprived him of his due process rights because the defamatory publication of

---

[82]      *See Drayton*, 536 U.S. at 206-07.

[83]      The amended complaint could conceivably be read to assert claims for excessive force and malicious prosecution.  Unfortunately for Mr. Reeves, there is no evidence in the record that force, much less excessive force, was used against him, nor was he ever prosecuted.  It is unfathomable that Mr. Reeves insists that a factual dispute exists over either of these claims.  Summary judgment on both of them is granted to defendants as well.  *See, e.g.*, *Faruki v. City of N.Y.*, 517 Fed. App'x 1, 2 (2d Cir. 2013) (stating the obvious:  to prevail on a claim for excessive force, there must be some evidence of use of force, and to prevail on a claim for malicious prosecution, the plaintiff must show as a threshold matter that judicial proceedings were initiated against him).

conduct for which he was never arrested or afforded a hearing ruined his reputation and employment prospects.  As established in *Valmonte v. Bane*, however, "defamation is not by itself a deprivation of a liberty interest unless coupled with the termination of government employment 'or deprivation of some other legal right or status.'"[84]  Mr. Reeves argues that the "plus" aspect of the "stigma-plus" test is satisfied because publication of the allegations against him has cost him his job and prevented him from finding steady full-time employment.[85]  In *Valmonte*, however, the Second Circuit emphasized that the

> deleterious effects which flow directly from a sullied reputation would normally also be insufficient [to satisfy the plus].  These would normally include the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation.[86]

Mr. Reeves was not terminated from government employment, nor has he been deprived of "'some other legal right or status.'"[87]  Therefore, Mr. Reeves has not been deprived of a constitutionally protected liberty interest in his reputation.

Accordingly, summary judgment is granted to defendants on Mr. Reeves's stigma

---

[84]     *Valmonte*, 18 F.3d at 1000 (quoting *Neu*, 869 F.2d at 667).

[85]     *See* Reeves Aff. ¶ 42.

[86]     *Valmonte*, 18 F.3d at 1001.

[87]     *Id.* at 1000 (quoting *Neu*, 869 F.2d at 667).  For this reason, I need not address whether the police bulletin was in fact defamatory.

plus claim.

### C.    There Is No Evidence to Support Claims for Municipal Liability

Plaintiffs' claims imputing liability on the Village of Bronxville for the alleged violation of plaintiffs' constitutional rights fail for two simple reasons. *First*, plaintiffs' constitutional rights were not violated.  *Second*, even if their constitutional rights were violated, plaintiffs have not alleged a single fact concerning a municipal policy or custom causing a rights violation, nor is there any such evidence in the record.  It is axiomatic that there cannot be a material dispute of fact over a claim when no facts or allegations are asserted in support of that claim.  Therefore, neither the Village of Bronxville nor the Village of Bronxville Police Department, to the extent the latter is even capable of being sued, can be held liable, and the claims against them are dismissed.[88]

### D.    State Law Claims

Because there are no remaining federal claims, I decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claims against defendants.[89]

---

[88]     *See Cash*, 654 F.3d at 333.

[89]     *See Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994) (stating that "it is axiomatic that a court should decline to exercise jurisdiction over state-law claims when it dismisses the federal claims prior to trial").

## VI.  CONCLUSION

For the reasons set forth above, defendants' motion for summary
judgment is GRANTED.  The Clerk of the Court is ordered to close the motion
[Docket No. 18] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 24, 2014

23

**-Appearances-**

**For Plaintiffs:**

Philip Russell, Esq.
Philip Russell, LLC
66 Field Point Road
P.O. Box 1437
Greenwich, CT 06836
(203) 661-4200

**For Defendants:**

Matthew Weir, Esq.
Morris Duffy Alonso & Faley
2 Rector Street
New York, NY 10006
(212) 766-1888